|  |  |  |
|---|---|---|
| **GIUSEPPE BOCCANFUSO,** | : | |
| **Plaintiff,** | : | **No. 3:17-CV-00162 (VLB)** |
| | : | |
| **v.** | : | |
| | : | **Marc 11, 2019** |
| **EDWARD ZYGMANT, TERRANCE** | : | |
| **DUNN, JR., PHILLIP RESTIERI,** | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT [DKT. 41]

Plaintiff Giuseppe Boccanfuso brought this action against Defendants Edward Zygmant, Fire Marshal for the Town of Westport, Terrance Dunn, Jr., Fire Inspector for the Town, and Philip Restieri, a Detective with the Westport Police Department, on February 4, 2017.  Plaintiff alleges violations of his Fourth Amendment rights (*Franks* violations), false imprisonment, malicious prosecution and negligent infliction of emotional distress arising out of his arrest, the prosecution, and his acquittal for his alleged reckless endangerment of the public and failure to abate a fire hazard.[1]  Before the Court now is Defendants' Motion for Summary Judgment on all claims.  [Dkt. 41 (Summ. J. Mot.)].  For the reasons discussed below, the Court grants Defendants' Motion in full and awards judgment for Defendants on all claims.

---

[1] **The Court previously dismissed Plaintiff's reckless infliction of emotional distress claim on Defendants' motion.  [Dkt. 28 at 4].**

## Background

In or around 1989, Dominic and Crescienzo Boccanfuso installed a 2,000-gallon underground storage tank ("UST") underneath a parking area in the front of the Boccanfuso Brothers Garage (the "Garage"), located at 940 Post Road East, in Westport, Connecticut, which they used to store gasoline for a number of years. [Dkt. 41-2 (Defs.' R. 56(A)(1) Stat.) at ¶¶ 5-7]. It is unclear when exactly the Boccanfusos ceased use of the UST, but the parties agree it was no longer in use by 2009. *Id.* at ¶¶ 7-8; [Dkt. 56-7 (Pl.'s Resp. Defs.' R. 56(a)(1) Stat.) at ¶¶ 7-8 Resps].

In October 2011, a tank-testing technician from Absolute Tank Testing, Inc. ("ATT") conducted sampling of the soil around the UST, with the results indicating detectable concentrations of extractable total petroleum hydrocarbons ("ETPH") of 540 parts per million ("PPM"). [Dkt. 41-2 at ¶ 9; Dkt. 41-8 (ATT Letter) at 1]. The letter reporting these results indicated that this amount was above the 500 PPM maximum allowable concentrations of ETPH in soil at a residential site and recommended the removal of the UST and remediation of any contaminated soil. [Dkt. 41-8 at 2]. Plaintiff contends that the Garage is a commercial site subject to the 2500 PPM maximum. [Dkt. 56-7 at ¶ 9 Resp.].

In March 2013, a representative of the Department of Energy and Environmental Protection ("DEEP"), Mr. Tyson, called Dominic Boccanfuso and told him that they could not abandon the UST, but must either cut a hole in it and fill it with gravel or remove it from the ground. [Dkt. 41-2 at ¶¶ 10-11]. Following this conversation, Dominic Boccanfuso told Plaintiff that Mr. Tyson had said that they should fill or remove the UST. *Id.* at ¶ 13.

On or about March 28, 2013, Plaintiff and Dominic Boccanfuso began excavating the ground about the UST using Plaintiff's backhoe. *Id.* at ¶ 14. While driving by, Defendants Zygmant and Dunn observed the excavation work occurring and approached the property. *Id.* at ¶ 15. When Zygmant and Dunn asked Plaintiff and Dominic Boccanfuso what they were doing, they explained that they were filling the UST with gravel and provided Zygmant and Dunn with the ATT letter from 2011. *Id.* at ¶ 17. Zygmant and Dunn were not aware of DEEP having permitted the Boccanfusos to excavate the UST, as the Fire Department had no record of the Boccanfusos applying for removal or abandonment of the UST, so they stopped the excavation work. *Id.* at ¶ 18.

When Dunn contacted DEEP about the UST, it dispatched its representative, David Poynton an Emergency Response Coordinator. *Id.* at ¶ 20. Poynton met Dunn at the Garage—Zygmant had left by that time. *Id.* The parties dispute what observations and guidance Dunn and Poynton provided to the Boccanfusos during the interaction at the Garage on March 28, 2013. Defendants claim that Dunn and Poynton told the Boccanfusos that they needed to follow local regulations, including potentially getting permits to remove the UST. *Id.* at ¶ 22-24; [Dkt. 56-7 at ¶¶ 22-24 Resps.]. Defendants further claim that Dunn told the Boccanfusos that they needed to apply with the Fire Marshal's office and that a fire watch was necessary while the tank was being inerted and removed from the ground. [Dkt. 41-2 at ¶¶ 25, 29-30]. Plaintiff claims that Dunn ultimately told him that a permit was not necessary and that Poynton said that a fire watch would only be necessary if they cut the UST. *Id.* at ¶¶ 26, 31; [Dkt. 56-7 at ¶¶ 25, 29-30 Resps.]. Plaintiff was

under the impression that Poynton had given permission for removal of the UST. [Dkt. 41-2 at ¶ 31; Dkt. 56-7 at ¶ 31 Resp.]. The parties seem to agree that Dunn and Poynton told the Boccanfusos that the UST needed to be inerted—purged of flammable vapors—and cleaned before it could be removed. [Dkt. 56-7 at ¶ 29, 29 Resp].

On March 29, 2013, Plaintiff removed the UST from the ground. [Dkt. 41-2 at ¶ 33]. Plaintiff claims that there was no residual gasoline or flammable vapors in the tank when he removed it. *Id.* at ¶ 34. He testified at his deposition that the tank was aired out, dried, and emptied and that he used his "eyes, a vacuum, [and] air" to confirm. [Dkt. 41-7 (G. Boccanfuso 1/23/18 Dep. Tr.) at 55:20-56:25]. That day, Westport Fire Inspector Gibbons notified Zygmant and Dunn that the UST had been removed. [Dkt. 41-2 at ¶ 36]. On April 1, 2013, Zygmant went to the Garage and observed that the UST had been removed and Dunn contacted the Boccanfusos to gather more information. *Id.* at ¶¶ 37-39. The Boccanfusos told Dunn that they believed they were allowed to remove the tank and that DEEP had given them permission to do so. *Id.*

On April 2, 2013, Zygmant and Dunn met with Detective Restieri, John Doucette, a Fire and Life Safety Specialist with the Office of the State Fire Marshal, and Trooper Michael Marino of the Connecticut State Police. *Id.* at ¶¶ 41-42. They determined that the Boccanfusos had failed to comply with safety regulations and had recklessly endangered the public because of the potential explosive vapors in the UST. *Id.* That afternoon, Zygmant returned to the Garage, observed the UST in the rear of the property next to a backhoe and a pile of soil, and called the Westport

Fire Department to request a response for metering. *Id.* at ¶ 44. Members of the Westport Fire Department (Assistant Fire Chief William Dingee and Firefighters Christopher Swartz, Mike Grasso, and Paul Wohlforth) went to the Garage, where they smelled gasoline. *Id.* at ¶¶ 45-46. Dingee and Swartz, both certified hazardous materials technicians, used two Industrial Scientific M40 Multimeters—devices used to measure the relative concentration of carbon monoxide, oxygen, hydrogen sulfide, and combustible gases—to monitor the atmosphere around and within the UST. *Id.* at ¶¶ 44-47. With one meter they obtained a reading of 20% over the lower explosive limit around the exterior of the UST and with the other they obtained a reading of 100% plus "over range" of the lower explosive limit within the UST. *Id.*

Plaintiff asserts that they did not test the inside of the UST and that the results would not have been able to show flammable vapors, but he was not at the Garage when the testing was done and has no actual basis for such assertions. [Dkt. 56-7 at ¶¶ 47-48 Resps.; Dkt. 41-11 at 64:2-68:5]. Plaintiff further represents that there were no flammable vapors or liquid in the UST when it was removed and tested. *Id.* at ¶ 49 Resp.; [Dkt. 41-2 at ¶ 49]. Plaintiff relies on his own and Dominic Boccanfusos actions and observations, as well as those of Poynton and Firefighter Gibbons, who Plaintiff asserts reported that the tank was empty and not a hazard. [Dkt. 56-7 at ¶¶ 49-50 Resps.].

DEEP was called regarding the UST and Poynton responded on their behalf. [Dkt. 41-2 at ¶ 51]. Defendants assert that Poynton told the Boccanfusos that the UST had to be cleaned and inerted and that they should hire a contractor to conduct the work. *Id.* at ¶ 52. Plaintiff denies that such a conversation took place. [Dkt. 56-

7 at ¶ 52 Resp.]. The contractor, Connecticut Tank Removal ("CTR"), arrived at the property that same afternoon and inerted and cleaned the tank with a fire watch present. [Dkt. 41-2 at ¶ 53]. Plaintiff claims that the UST did not need to be inerted because it was empty. [Dkt. 56-7 at ¶ 53 Resp.].

On April 11, 2013, Dunn met with Detective Restieri and Trooper Marino and they determined that there was probable cause to bring charges against Plaintiff because he had removed the UST without following the required procedures and had disregarded the instructions of Dunn and Poynton. [Dkt. 41-2 at ¶ 54]. They waited until December 2013, when the State Police completed their investigation and report on the matter, before pursuing charges. *Id.* at ¶¶ 54-55. The report, prepared by Trooper Marino, concluded that (1) Dominic Boccanfuso did not have proper soil samples conducted; (2) the soil samples were positive for contamination; (3) Dominic Boccanfuso did not contact the Westport Fire Marshal; (4) Dominic Boccanfuso did not apply for a permit to remove the UST; (5) Dominic Boccanfuso did not set up a fire watch; (6) Plaintiff illegally removed the UST; and (7) Plaintiff acted recklessly by removing the UST. *Id.* at ¶ 55; [Dkt. 41-16 (Investigative Report) at 10-11].

After reviewing the report, reports from the Westport Fire Marshal's office, Poyton's field narrative, and the relevant statutes, Dunn and Restieri again determined that probable cause existed to charge Plaintiff with reckless endangerment in the first degree in violation of Conn. Gen. Stat. § 53a-63 and failure to abate a fire hazard in violation of Conn. Gen. Stat. § 29-306. *Id.* at ¶ 56.

In or around February 2014, Dunn and Restieri prepared an application for a warrant for Plaintiff's arrest on those charges and it was submitted to the Superior Court of Connecticut in Norwalk and signed by a judge. *Id.* at ¶ 57. Both Dunn and Restieri signed the warrant application. [Dkt. 41-17 (Application for Arrest Warrant)]. On March 3, 2014, Restieri informed Plaintiff of the arrest warrant and requested he come to the Westport Police Department, where Restieri arrested, booked, processed, and released Plaintiff without incident. *Id.* at ¶¶ 59-60. Plaintiff appeared in court on March 13, 2014 and estimates that he appeared in court in connection with the charges once a month for the next two years. *Id.* at 63. On April 21, 2016, the Court dismissed the charges against Plaintiff at the request of the State. *Id.* at ¶ 66.

Plaintiff initiated this suit on March 4, 2017, bringing claims for a *Franks* violation under 42 U.S.C. § 1983, reckless infliction of emotional distress, negligent infliction of emotion distress, false imprisonment, and malicious prosecution. *See* [Dkt. 1 (Compl.)]. The Court dismissed Plaintiff's reckless infliction of emotional distress claim on Defendants' Motion to Dismiss. *See* [Dkt. 13 (Decision on Mot. to Dismiss) at 4]. Defendants now move for summary judgment on the four remaining counts.

<u>Summary Judgment Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d

98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *14 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

However, a party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, . . . or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518 (citations omitted). Nor will "conclusory statements, conjecture, or speculation by the party resisting the motion" defeat

summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

Furthermore, summary judgment is an appropriate method of resolving disputes concerning indemnification agreements. *Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201 (5th Cir.1996); *Commercial Ins. Co. of Newark v. Pacific–Peru Constr. Corp.*, 558 F.2d 948 (9th Cir.1977); *Cont'l Cas. Co. v. Am. Sec. Corp.*, 443 F.2d 649 (D.C.Cir.1970).

<u>Discussion</u>

I.    <u>*Frank*s Violation</u>

The Fourth Amendment provides the "right not to be arrested or prosecuted without probable cause." *Soares v. Conn.*, 8 F.3d 917, 920 (2d Cir. 1993) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992). Plaintiff's first count alleges a violation of that Fourth Amendment right, claiming a *Franks* violation under 42 U.S.C. § 1983. Specifically, Plaintiff alleges that Defendants knowingly or recklessly included false statements or omitted information from the warrant application which was material, or necessary, to the finding of probable cause to arrest him for reckless endangerment of the public and failure to abate a fire hazard.

## A. The *Franks* Standard

The issuance of a warrant by a judge, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause.  *Golino*, 950 F.2d at 870.  However, a plaintiff can demonstrate that his or her right not to be arrested absent a warrant supported by probable cause "was violated where the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'"  *Soares*, 8 F.3d at 920 (quoting *Golino*, 950 F.2d at 870-71).  Thus, a plaintiff will prevail on a *Franks* claim if he or she shows (1) that the affidavit contained "[an omission or] a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) "the [omitted information or] allegedly false statement is necessary to the finding of probable cause."  *Franks v. Delaware*, 438 U.S. 154, 155 (1978).  "[R]ecklessness may be inferred where the omitted information was critical to the probable cause determination."  *Golino*, 950 F.2d at 870 (internal citations omitted).  "Unsupported conclusory allegations of falsehood or material omission cannot support a *Franks* challenge."  *Veraldi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994).

"A false statement 'is material when the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding."  *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) (quoting *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003)) (internal quotation marks and brackets omitted).  "The

materiality of a misrepresentation or an omission in this context is a mixed question of law and fact.  The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law.  But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases."  *Id.* at 574.

The probable cause standard is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'"  *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "While probable cause requires more than a 'mere suspicion,' of wrongdoing," *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Mallory v. United States*, 354 U.S. 449, 455 (1957)), "it is clear that 'only the probability, and not a prima facie showing, of criminal activity'" is required.  *Martin*, 426 F.3d at 74 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  It is a "common-sense test" that "turns on an 'assessment of probabilities' and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence."  *Id.*  "Simply put, probable cause is a 'relaxed standard,' . . . not a legal determination of guilt or liability."  *Id.* (internal citations omitted).

"In determining whether omitted information was necessary to the finding of probable cause, 'we look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable

cause to make the arrest as a matter of law.'" *McColley v. Cty. Of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (citing *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "In performing the 'corrected affidavit' analysis, 'we examine all of the information the officers possessed when they applied for the arrest warrant.'" *Id.* (quoting *Escalera*, 361 F.3d at 743). "While the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause, he must not omit circumstances that are critical to its evaluation." *Id.* (quoting *Walczyk*, 496 F.3d 139, 161 (2d Cir. 2007)) (internal quotation marks omitted). Additionally, "every statement in a warrant affidavit does not have to be true." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). As the foregoing illustrates, "[t]he *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d 1991).

Whether the untainted portions of a warrant affidavit suffice to support a probable cause finding is a legal question. *Martin*, 426 F.3d at 74; *Walczyk*, 496 F.3d at 157 (citing *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878)) ("It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.").

### B.  Plaintiff's *Franks* Allegations

Here, the warrant application affidavit sought an arrest warrant for Plaintiff's violation of Connecticut General Statute § 53a-63, reckless endangerment in the first degree, and § 29-306, abatement of a fire hazard. [Dkt. 41-17 at 2]. "A person is guilty of reckless endangerment in the first degree when, with extreme

indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person." Conn. Gen. Stat. § 53a-63. The abatement of fire hazards statute provides as follows:

> When the local fire marshal ascertains that there exists in any building, or upon any premises, (1) combustible or explosive matter, dangerous accumulation of rubbish or any flammable material especially liable to fire, that is so situated as to endanger life or property . . . the local fire marshal shall order such materials to be immediately removed or the conditions remedied by the owner or occupant of such building or premises. Any such removal or remedy shall be in conformance with all building codes, ordinances, rules and regulations of the municipality involved.

Conn. Gen. Stat. § 29-306(a). Defendants Restieri and Dunn prepared and signed the affidavit supporting the warrant application. [Dkt. 41-17 at 4]. The affidavit recounts the events on and around the Boccanfuso Garage and the observations and actions of Defendants Zygmant and Dunn and the Boccanfusos. *See id.*

Defendants argue that Plaintiff has insufficient evidence to rebut the presumption of probable cause created by the issuance of the arrest warrant. [Dkt. 41-1 at 15]. In addition, Defendants contend that there is no evidence of Defendant Zygmant's involvement in drafting, executing, or submitting the arrest affidavit such that he would be liable under § 1983. *Id.* Plaintiff argues that Defendants omitted from the arrest warrant material facts which would have undermined the finding of probable cause and included falsehoods which, if removed, would undermine the probable cause finding. [Dkt. 56 at 7-8]. Defendants contend that, even correcting the alleged omitted and falsified information in the warrant affidavit, there was still enough information for Defendants Dunn and Restieri to

reasonably believe that probable cause existed such that they are entitled to qualified immunity. [Dkt. 41-1 at 30].

## C. Defendant Zygmant – Personal Involvement

First, the Court considers whether Defendant Zygmant had personal involvement in the alleged *Franks* violation such that he is liable under § 1983. The Supreme Court has held that respondeat superior may not serve as the basis for imposing § 1983 liability. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). "The Supreme Court's rejection of respondeat superior as a basis for § 1983 liability necessarily means that each defendant, whether an individual or entity, may be held liable only for that defendant's own wrongs. This principle is invoked most frequently and prominently in the context of municipal entity and supervisory officer liability, but applies to all defendants sued under § 1983." Schwartz, Section 1983 Litig. Claims & Defenses, § 6.04 Rule Against Respondeat Superior Liability. In *Rizzo v. Goode*, the Supreme Court held that superior officers cannot be held liable under § 1983 merely because of their authority to control subordinate employees. 423 U.S. 362 (1976). As a result, an official must have been "personally involved" in a violation of the plaintiff's federal rights for him or her to be subject to § 1983 liability. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991).

The violation of Plaintiff's rights alleged in this claim is that Defendants falsified information in the warrant affidavit or omitted information from the warrant affidavit which would have negated the finding of probable cause. Defendants argue that Zygmant had no personal involvement in the affidavit and therefore is

not subject to § 1983 liability on this claim.  Plaintiff argues that Zygmant was personally involved, and thus subject to § 1983 liability, even though he was not an affiant to the warrant application.  [Dkt. 56 at 12].  The Court agrees with Plaintiff given that facts here.

Plaintiff cites to cases from other circuits where courts held certain government experts (e.g. coroners, forensic chemists, and bite mark experts) liable for *Franks* violations.  *Id.* at 13 (citing *Burke v. Town of Walpole*, 405 F.3d 66, 89 (1st Cir. 2005); *Pierce v. Gilchrist*, 359 F.2d 1279, 1296 (10th Cir. 2004); *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002); *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1197 (D. Ariz. 2008)).  While the cited decisions are not binding on the Court, they are instructive here.

In *Galbraith v. County of Santa Clara*, the Ninth Circuit held in deciding a motion to dismiss that "a coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth Amendment." 307 F.3d at 1226-27.  Likewise, on a motion to dismiss in *Pierce v. Gilchrist*, the Tenth Circuit sustained the plaintiff's § 1983 malicious prosecution claim against the government's forensic chemist based on the plaintiff's allegations that she, "with knowing and reckless disregard for the truth, informed the police and prosecutorial authorities" that certain evidence supported the defendant's involvement in a rape even though that evidence tended to exonerate him.  359 F.3d at 1293-94.  In *Burke v. Town of Walpole*, the First Circuit considered on summary judgment whether there was sufficient evidence that two forensic odontologists

deprived the plaintiff of his constitutional rights by "render[ing] a bite mark opinion with deliberate falsity or reckless disregard for the truth" that was used in the warrant application and was material to the probable cause determination. 405 F.3d at 89. Finally, on a motion for summary judgment in *Lacy v. County of Maricopa*, the district court considered whether there was evidence that a medical examiner "formed revised opinions with reckless disregard as to their truth and [whether] those allegations may have been both instrumental in the prosecutor's charging decisions as well as material to the outcome of the trial." 631 F. Supp. 2d at 1206-07. In each of these cases, while the specific defendant was not an affiant to the warrant affidavit or making the decision to prosecute, each allegedly provided information or evidence critical to the probable cause finding and, as a result, each was open to liability under § 1983.

Here, like the defendants in Plaintiff's cited cases, Defendant Zygmant provided information which was material to the finding of probable cause—that Dingee and Swartz metered the UST and the results showed dangerous levels of flammable vapors. Defendat Zygmant was with Defendant Dunn when they approached the Garage and Plaintiff on March 28, 2013. *See* [Dkt. 41-3 (Zygmant Aff.) at ¶¶ 4-5]. Defendant Zygmant returned to the Garage on April 2, 2013, without Defendant Dunn, and requested hazmat certified firefighters come meter the UST. *Id.* at ¶¶ 17-19. Defendant Zygmant is the only defendant who was present for the metering. *Id.* Defendant Zygmant wrote a report documenting the relevant events, [Dkt. 41-3 at 9-10], and provided facts to Defendants Dunn and Restieri which they relied on in drafting the warrant affidavit. *See* [Dkt. 41-17 at ¶ 11]. Thus, had

Defendant Zygmant's report and statements omitted information or included false information material to the probable cause finding which Defendants Dunn and Restieri then used in preparing the warrant affidavit, Defendant Zygmant would potentially have knowingly or recklessly contributed to a violation of Plaintiff's Fourth Amendment right. Contrary to Defendants' assertion, *see* [Dkt. 57 at 6], Defendant Zygmant did provide information which became a critical basis for the charges brought against Plaintiff and the ensuing prosecution.

Defendant Zygmant is not exposed to liability because of his supervisory role as the Fire Chief or because he oversaw the Westport Fire Department, as the case law indicates is improper. Rather, it was Defendant Zygmant's personal involvement in the events leading up the drafting of the arrest warrant affidavit and his provision of information critical to the probable cause finding that establish his liability here. As such, the Court concludes that Defendant Zygmant was personally involved and is subject to § 1983 liability. However, as discussed below, the Court concludes that there was probable cause to support Plaintiff's arrest and prosecution, and Defendants are therefore entitled to summary judgment.

### D. The "Corrected" Affidavit Supports a Finding of Probable Cause

The Court concludes that the affidavit, after being corrected for the alleged omissions and falsifications, still supports a probable cause finding. Because the Court concludes that the amended affidavit still supports probable cause, the Court need not reach the question of whether there is a dispute of fact as to the omissions and falsifications or whether they were made knowingly or recklessly. *See Martin*, 426 F.3d at 74 (citing *Franks*, 438 U.S. at 156).

The warrant affidavit states that Defendants Zygmant and Dunn arrived at the Garage on Thursday, March 28, 2013, and "detected a heavy odor of gasoline." [Dkt. 41-17 at 4 ¶ 3]. When asked, the Boccanfusos provided Defendants with the results of the ATT soil sample testing from October 2011, which indicated contamination levels above those allowed for residential sites and recommended proper removal of the UST and remediation of soil contamination in accordance with applicable state and local regulations. *Id.* at 4 ¶ 4; [Dkt. 41-8 at 1-2]. Defendants Zygmant and Dunn and Poynton of the DEEP told the Boccanfusos that they needed to properly clean and inert the UST before they could close or remove it. [Dkt. 41-17 at 5 ¶ 5]. That day, the Boccanfusos contacted CTR and scheduled for CTR to come to the Garage on Monday, April 1, 2013, to evaluate closure of the UST and provide a cost estimate. *Id.* at 5 ¶ 6.

The warrant affidavit further states that, on Friday, March 29, 2013, Fire Inspector Gibbons saw that the UST had been removed from the ground and moved to the rear of the Garage property. *Id.* at 5 ¶ 7. The affidavit states that residential occupancies border the rear of the Garage property, with a Men's Warehouse next door and a Starbucks and an office building across the street. *Id.* at 6 ¶ 12. Defendants Dunn and Zygmant, as well as Westport Police Officer Heinmiller, observed the UST at the back of the property on Monday, April 1, 2013. *Id.* at 5 ¶ 8. When Defendant Dunn spoke to Dominic Boccanfuso over the phone later that day, Dominic Boccanfuso indicated that CTR had visited the Garage but "they wanted $1600.00 for five soil samples which it [sic] robbery." *Id.* at 5-6 ¶ 10. Dominic Boccanfuso also indicated that Giuseppe Boccanfuso had removed the UST from

its grave and told Defendant Dunn that he was "making a big deal out of nothing" before hanging up on him. *Id.*

The warrant affidavit goes on to state that Defendant Zygmant visited the Garage on Tuesday, April 2, 2013, at which time he requested to have the UST and surrounding soil metered by fire department personnel. *Id.* at 6 ¶ 11. Assistant Chief of the Westport Fire Department William Dingee and Firefighter Christopher Swartz of the Westport Fire Department, both of whom had hazmat certification, metered the tank. *Id.* The metering "detected high concentration of flammable vapors, (100% over range of the Lower Explosive Limit) and [the UST] was deemed a high hazard to the public." *Id.* At that point, CTR was contacted to properly clean and inert the UST and soon thereafter arrived at the Garage and rendered the UST safe with a fire watch standing by. *Id.* at 6 ¶ 14.

These facts, as laid out in the warrant affidavit, establish that Plaintiff knew or should have known that potentially hazardous fumes had been detected in and around the UST, as evidenced by the 2011 ATT report. *See id.*; *see also* Dkt. 56-3 (G. Boccanfuso Dep. Tr.) at 16:1-21. Plaintiff knew or should have known that the UST potentially constituted combustible or explosive matter that presented a dangerous situation. Plaintiff further knew or should have known that certain steps needed to be taken to render the UST safe.

Plaintiff did not clean the UST himself, nor did he see anyone else clean the UST. [Dkt. 41-11 at 16-18]. Plaintiff testified that he believed the UST was cleaned after it was emptied but did not know when that might have happened. [Dkt. 56-3 at 20:6-12]. He also testified that he did not know whether the UST was tested for

flammable vapors after it was emptied. *Id.* at 20:13-22. Despite this, Plaintiff suggests that he was sure that the UST was not a hazard because it was aired out, dried, and emptied and because he used his "eyes, a vacuum, [and] air" to confirm the absence of liquid and flammable vapors. [Dkt. 41-7 (G. Boccanfuso 1/23/18 Dep. Tr.) at 55:20-56:25]. This was a reckless conclusion.

Testing of the UST after Plaintiff removed it from its grave confirmed the existence of high levels of flammable contaminants in and around the UST. [Dkt. 41-14 (Dingee Aff.) at ¶¶ 8-9; Dkt. 41-15 (Swartz Aff.) at ¶¶ 8-9]. Plaintiff chose not to ensure the safety of others by cleaning and inerting the UST or by enlisting professional services to render the UST safe, apparently because the Boccanfusos did not like the price tag associated with taking the proper steps. These facts establish that probable cause existed for Plaintiff's arrest for failure to abate a fire hazard and reckless endangerment.

### E. The Alleged Omitted Facts Are Not Material

Plaintiff contends that Defendants omitted from the warrant affidavit the following facts: (1) the permit and tracking form requirements for residential tank removals did not apply to Plaintiff's commercial garage; (2) Firefighter Gibbons' report stated that the UST was empty; (3) Poynton testified that the UST was in the ground, empty, and had been pumped out; (4) Poynton concluded that the UST was not a fire hazard; (5) the Boccanfusos did not cut the UST; (6) Poynton found no safety or health problems during his inspection; (7) Poynton did not tell the Boccanfusos that they needed a fire watch; (8) Poynton did not deem the situation a safety hazard. [Dkt. 56 at 7-8].

Inclusion of these omitted alleged facts does not negate the probable cause finding. Even if the warrant affidavit stated that a permit and fire watch were not required by the relevant regulations, the warrant still establishes that there was contamination and potentially hazardous conditions which Plaintiff should have known required professional handling. A question as to what exactly the regulations required for the removal does not negate the fact that Plaintiff's conduct was reckless. Plaintiff was not arrested and prosecuted for violation of a regulation, but for reckless endangerment and failure to abate a fire hazard. Additionally, the question is whether probable cause existed at all, without a requirement that the offense actually charged is the same as that which provided probable cause to arrest. *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). Probable cause may exist where a defendant is later charged with an offense other than the charge of arrest. *Id.* Because Defendants had probable cause to arrest Plaintiff for the charged crimes, there is no need to consider whether probable cause existed for any uncharged statutory violations. *See id.*

Nor would the analysis change if the warrant stated that Firefighter Gibbons' report indicated that the UST was empty. First, even if the report said as much, it does not negate the findings by ATT and later by Dingee and Swartz that the UST contained flammable vapors—flammable vapors which would not necessarily be visible. Second, Firefighter Gibbons' report, which Defendants attached to their Reply in support of the Motion for Summary Judgment, *see* [Dkt. 57-1 at 4-5], does not state that the UST was empty. It does, however, state that Firefighter Gibbons saw someone using a gas-powered saw to cut the asphalt surface around the UST

while also smelling a "strong odor of petroleum" from his location 50-feet away from the excavation site. *Id.* at 5. Thus, rather than negating the finding of probable cause, the content of Firefighter Gibbons' report would seem to enhance that finding.

Inclusion of the fact that the Boccanfusos did not cut the UST would not detract from the finding of probable cause either. Cutting the UST may have escalated the safety hazard, as sparks caused by the metal on metal friction could have ignited the flammable vapors. But the contamination existed and posed a potential threat with or without the cutting of the UST.

The alleged statements and conclusions by Poynton—that the UST was in the ground and empty, that it was not a fire hazard and did not present safety or health problems, and that he made no representation that a fire watch was needed—are immaterial as well. Mr. Poynton is a state official who acknowledged in his deposition testimony that, while he did not deem the UST a fire or safety hazard, others may have, and the Boccanfusos still needed to follow local regulations regarding closure of the UST. [Dkt. 41-10 (Poynton Dep. Tr.) at 9:17-10:15, 19:2-14, 23:15-17]. There is no evidence that Mr. Poynton conducted a full assessment of the UST or metered the tank to determine vapor levels. Whether or not Mr. Poynton observed that the UST was empty, the results of the metering by ATT and Dingee and Swartz, which indicated contamination, evidence the existence of a potential hazard. Indeed, Poynton testified at his deposition that Plaintiff should have cleaned and inerted the UST before removing it from its grave. *Id.* at 38:11-16. The lack of an affirmative statement by Poynton that a fire watch

was required does not change the conclusion either. Even if the DEEP official did not lay out all applicable regulations for Plaintiff, he is not absolved of his duty not to handle the UST recklessly. Indeed, every person is presumed to know the law and ignorance or mistake of the law is generally no defense to a criminal prosecution. *Cheek v. United States*, 498 U.S. 192, 199 (1991). The evidence supports a finding of probable cause that Plaintiff did not act reasonably, but acted recklessly, in his handling of the UST and failure to abate a fire hazard.

### F. The Alleged Falsehoods Are Not Material

Plaintiff asserts that Defendants misrepresented certain facts as well. Plaintiff's memorandum includes a list of ten falsehoods, which the Court has distilled to the following: (1) contrary to the warrant affidavit's assertion that a fire watch was required, neither Dunn nor Zygmant told the Boccanfusos they needed a fire watch—they said one would only be necessary if the Boccanfusos cut the UST, which they did not; (2) contrary to the warrant affidavit's statement that there was a high hazard to the public, Poynton did not deem the UST a safety or fire hazard, found no issues during his response at the Garage, and reported that the UST was in the ground and empty, and DEEP closed its investigation without finding any violations; (3) contrary to the warrant affidavit's claim that the high hazard required a permit, both Dunn and Zygmant told the Boccanfusos that they did not need a permit; (4) contrary to the warrant affidavit's representation that there was a high hazard to the public, Firefighter Gibbons' report stated that the UST was empty. *Id.* at 8-10.

Essentially, Plaintiff argues that the warrant affidavit's claims that the situation created a high hazard and that a fire watch was required are falsehoods. Correction or exclusion of these alleged falsehoods listed by Plaintiff, *see* [Dkt. 56 at 8-10], similarly fails to negate the finding of probable cause.

Even when the fire watch requirement is removed from the warrant affidavit, the facts discussed above remain to establish that Plaintiff knew or should have known of the possibly dangerous conditions and that there were proper methods for rendering the UST safe which Plaintiff failed to observe.  While inclusion of the fact that Plaintiff was told numerous times by Defendants that a fire watch was necessary increased Plaintiff's culpability, as his disregard of such instructions increases the recklessness of his conduct, the probable cause finding does not rest on that fact alone.  Plaintiff's conduct was not reckless merely because he declined to obtain a permit and fire watch as Defendants allegedly directed. Regardless of whether Defendants informed Plaintiff of the regulations, Plaintiff's recklessness as to the dangerous condition and his failure to remedy that condition in a responsible manner, as established by the other facts in the warrant application, constitute probable cause for reckless endangerment and failure to abate a fire hazard.  Defendants were not required to make sure that Plaintiff understood the regulations before they applied to him.  And Plaintiff did not need a full and effective understanding of the applicable regulations for his conduct to recklessly endanger the public.  Ignorance of the law is not exculpatory.

Regardless of Poynton's findings or whether Defendants told Plaintiff that a permit and fire watch were needed for the UST removal, the facts indicate that the

UST and surrounding soil were contaminated. *See* [Dkt. 41-17 at 4, 6 ¶¶ 4, 11; Dkt. 41-8 at 2; Dkt. 41-16 (Investigation Report) at 6; Dkt. 41-14 (Dingee Aff.) at ¶¶ 8-9; Dkt. 41-15 (Swartz Aff.) at ¶¶ 8-9]. Testing by ATT in 2011 evidenced contamination and metering by Dingee and Swartz on April 2, 2013, indicated high concentration of flammable vapors, 100% over range of the lower explosive limit, as reported in the warrant affidavit. *Id.* This supports Defendants' conclusion that the UST posed a high hazard to the public. Any determination by Poynton otherwise does not negate that conclusion. Poynton was not present for the metering and did not conduct his own sampling or metering. [Dkt. 41-10 at 12:9-12 ("Q: Did you conduct any testing of the materials in the tank or the tank itself? A: No. That's not our – that's not our job and our position to do."), 32:18-25 (Poynton testifying he did not witness the metering)]. Indeed, Plaintiff does not have any credible evidence to suggest that the testing results were inaccurate, fabricated, or otherwise unfounded.

The warrant affidavit, after correcting for the alleged misstatements and omissions, still supports a probable cause finding. As such, Defendants are entitled to summary judgment on the *Franks* claim.

### G. Qualified Immunity

"The qualified immunity or good faith immunity enjoyed by police officers shields them from personal liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, . . . or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Golino*, 950 F.2d at 870

(internal quotation marks and citations omitted).  The right not to be arrested or prosecuted without probable cause is, and has for some time been, a clearly established constitutional right.  *Id.*

"Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause."  *Id.*  The shield of qualified immunity is lost where the affiant "knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause."  *Id.* at 871.  "An officer can 'have no reasonable grounds for believing that a warrant was properly issued' 'if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.'"  *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).  Additionally, "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In considering qualified immunity, "a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause."  *Soares*, 8 F.3d 917, 920 (citing *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir. 1992)).

If probable cause exists, no Fourth Amendment violation has occurred. *Id.* "However, if the corrected affidavit does not support an objective finding of probable cause, then the court should conclude that material factual disputes prevent summary judgment for defendant on the qualified immunity defense." *Id.* (citing *Cartier*, 955 F.2d 845-46).

The Court has already concluded that, even accounting for the omissions and falsifications Plaintiff alleges, probable cause existed for Plaintiff's arrest. Thus, it was reasonable for Defendants to believe that probable cause existed and, even if the Court had not found Defendants entitled to judgment on the merits, they would have been entitled to qualified immunity on the *Franks* claim (Count I).

## II. False Imprisonment & Malicious Prosecution[2]

"In Connecticut, false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 386 (D. Conn. 2009) (quoting *Green v. Donroe*, 440 A.2d 973, 974 (Conn. 1982)) (internal quotations and brackets omitted). To prevail on a false imprisonment claim, "the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that

---

[2] It is not clear from Plaintiff's Complaint whether he is asserting a § 1983 malicious prosecution claim or strictly a Connecticut state law malicious prosecution claim. *See* [Dkt. 56 at 18]. In discussing the claim in his Opposition to the Motion for Summary Judgment, Plaintiff cites to the requirement of violation of his Fourth Amendment rights. *See id.* As such, the Court presumes that Plaintiff makes a § 1983 malicious prosecution claim. Additionally, given his discussion of the claim in his Opposition, the Court analyzes the claim despite the footnote asserting that he was withdrawing the claim, *see id.* at 2 n.1.

he did not consent to the restraint or acquiesce in it willingly." *Berry v. Loiseau*, 614 A.2d 414, 432 (Conn. 1992).

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). The Fourth Amendment provides the right to be free from unreasonable seizures, including arrest and prosecution without probable cause. *See Soares v. Conn.*, 8 F.3d 917, 920 (2d Cir. 1993) ("It is settled that a person has a clearly established right not to be arrested or prosecuted without probable cause."). Under Connecticut law, the malicious prosecution elements include: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Bhatia v. Debek*, 948 A.2d 1009, 1017 (Conn. 2008).

Defendants argue that the existence of probable cause defeats Plaintiff's false imprisonment and malicious prosecution claims. [Dkt. 41-1 at 36-37, 39]. Additionally, Defendants argue that they never restrained Plaintiff's liberty or otherwise confined him such that there was any false imprisonment of Plaintiff. [Dkt. 41-1 at 38-39]. They further argue that the malicious prosecution claim fails because there is no evidence that Defendants acted with malice in arresting Plaintiff. *Id.*

## A. <u>Probable Cause Defense</u>

It is well established that probable cause is a complete defense to claims of false imprisonment and malicious prosecution. *See Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007); *Williams v. Town of Greenburgh*, 535 F.3d 71, 78-79 (2d Cir. 2008). "The court may determine the existence of probable cause as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Johnson*, 496 F. Supp. 2d at 213 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

When an arrest is made pursuant to a warrant issued by a neutral magistrate, probable cause is presumed. *See Walczyk v. Rio*, 496 F.3d 139, 155-56 (2d Cir. 2007) ("Ordinarily, an arrest or search pursuant to a warrant issue by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause."). As discussed above, a plaintiff may overcome this presumption by showing that "the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'" *Soares*, 8 F.3d at 920 (quoting *Golino v. Town of New Haven*, 950 F.2d 864, 870-71 (2d Cir. 1991)); *see also Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

As laid out above, Plaintiff has failed to rebut the presumption of probable cause by showing that Defendants omitted or falsified information in the warrant application which impacted the finding of probable cause. Rather, the Court has concluded that, even correcting the alleged omissions and falsifications, the

warrant affidavit supports the probable cause finding. *See supra* at Sections I.D.-F.

Plaintiff argues that genuine issues of material fact prevent summary judgment on these claims—"(1) whether the tank was empty, (2) whether the tank was pumped out, (3) whether the tank presented a safety and or fire hazard[, ] (4) whether a fire watch was required, and [(5)] whether the tank was metered." [Dkt. 56 at 19]. In support, Plaintiff lists the same facts he alleges Defendants omitted from the warrant application affidavit. *See id.* at 7-8, 19-20. The Court has already considered whether the addition of these facts to the warrant affidavit impacts the finding of probable cause and found that not to be the case. *See supra* at Section I.E. These facts are not material in light of the facts establishing that probable cause existed.

Plaintiff represents that the tank was pumped out and empty and that it therefore was not a hazard. [Dkt. 41-7 at 55:16-56:25; Dkt. 41-11 (G. Boccanfuso 2/2/18 Dep. Tr.) at 40:8-22]. But even if it was empty, it was not necessarily cleared of the flammable vapors constituting a hazard, as the metering by Dingee and Swartz showed. Thus, any disputes as to these facts are immaterial. It is also immaterial whether a fire watch was required. As discussed above, the applicability of certain regulations does not determine whether there was probable cause to believe Plaintiff recklessly endangered others and failed to abate a fire hazard.

Any dispute as to whether the UST was metered and posed a hazard are also immaterial. The facts included in the warrant affidavit application establish that

Defendants had probable cause to believe that the UST was a hazard. Defendants observed a 2,000-gallon UST and smelled gasoline odors. Testing by ATT as well as the firefighters established the existence of flammable vapors. [Dkt. 41-8 at 2; Dkt. 41-14 at ¶¶ 8-9; Dkt. 41-15 at ¶¶ 8-9]. Defendants have provided affidavits from Defendant Zygmant, Assistant Chief Dingee, and Firefighter Swartz, attesting to the positive results of the metering. *Id.* Defendants also provided the contemporaneous activity report of Defendant Zygmant, which establishes that the hazmat certified firefighters were called, reported to the scene, conducted the metering, and concluded that there were dangerous levels of flammable vapors in the UST. [Dkt. 41-3 at 10]. The state investigation report indicates the same. [Dkt. 41-16 at 3, 6]. Defendants knew that Plaintiff excavated and removed the UST from its grave and placed it above ground in the back of the Garage property without using a contractor to first properly clean and inert it. These facts are sufficient to establish probable cause and Plaintiff does not raise a material dispute of fact which negates this conclusion.

Finally, Plaintiff has provided no evidence to credibly suggest that the firefighters did not meter the UST on April 2, 2013. While Poynton testified that he was not present for any metering and was only told that there were fuel odors, [Dkt. 56-4 at 33:1-12], this does not call into question the fact that the metering occurred and showed the results it did. While Poynton did not deem the UST a hazard, [Dkt. 41-10 at 37:17-21; Dkt. 41-19 at 4], Poynton's conclusion does not negate the conclusion of Defendants for the purposes of probable cause. Poynton did not conduct the same assessments as Defendants, nor did he observe the metering.

[Dkt. 41-10 at 17:8-17, 32:18-25].  Defendants took into consideration local regulations with which Poynton was not familiar, but which Poynton conveyed to Plaintiff he was required to follow.  [Dkt. 56-4 at 37:1-16, 19:2-14].  Thus, Plaintiff has not presented any evidence which creates a legitimate dispute as to whether the firefighters metered the UST.

Plaintiff has not presented any material disputes of fact which foreclose summary judgment on these claims.  Further, the Plaintiff has failed to rebut the presumption of probable cause established by the arrest warrant.  As a result, his false arrest and malicious prosecution claims fail.[3]

Even if the Court did not find that Defendants are entitled to judgment on the merits on these claims, they would be entitled to qualified immunity on the malicious prosecution claim, which Plaintiff appears to be asserting under § 1983.

Accordingly, Plaintiff's false imprisonment and malicious prosecution claims fail and Defendants are entitled to summary judgment on Counts IV and V.

### III.    Negligent Infliction of Emotional Distress

"To prove a claim of negligent infliction of emotional distress, the plaintiff must establish that the defendant knew or should have known that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in bodily harm."  *Copeland v. Home & Cmty. Health Servs., Inc.*, 285 F. Supp. 2d 144, 149 (D. Conn. 2003) (quoting *Buckman v. People*

---

[3] Because the Court has concluded that Plaintiff's arrest and prosecution were supported by probable cause, the Court need not consider Defendants' alternative arguments that Plaintiff's false imprisonment claim fails due to a lack of restraint or that his malicious prosecution claim fails due to a lack of evidence of malice.

*Express, Inc.*, 205 Conn. 166, 173, 530 A.2d 596 (1987)).  The Connecticut Supreme Court has recognized a cause of action for negligent infliction of emotional distress where no physical injury ensues to the victim.  *Montinieri v. S. New England Tel.*, 398 A.2d 1180, 1184 (Conn. 1978).

Defendants argue that Plaintiff's claim for negligent infliction of emotional distress fails as to two elements: (1) because the evidence does not demonstrate that Defendants' conduct created an unreasonable risk of causing Plaintiff emotional distress and (2) because the evidence does not show that his emotional distress was severe enough that it might result in illness or bodily harm.  [Dkt. 41-1 at 31].

A. Unreasonable Risk Of Causing Emotional Distress

At trial, Plaintiff would be required to show that Defendants' conduct created an unreasonable risk of causing the plaintiff emotional distress.  *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 128 (Conn. 2003).

For example, in *Carrol v. Allstate*, the Connecticut Supreme Court held that there was sufficient evidence to support a finding that the defendant's conduct created an unreasonable risk of causing the plaintiff's emotional distress, citing evidence that the defendant insurance company conducted an arson investigation to establish whether the plaintiff had engaged in conduct that was *criminal* and evidence that the defendant's investigation was both shoddy and possibly influenced by racial stereotypes.  815 A.2d at 128-29.  In contrast, in *Coderre v. City of Wallingford*, 2015 WL 4774391, at *9 (D. Conn. Aug. 13, 2015), the court concluded that there was insufficient evidence that the defendant's conduct—

bringing a larceny charge against the plaintiff following investigation and pursuant to an arrest warrant—created an unreasonable risk of causing emotional distress. *Coderre*, 2015 WL 4774391, at *1-3, 9. The court explained that the defendant "engaged in a constitutionally reasonable police investigation, and he drafted an arrest warrant application when he believed that plaintiff committed a crime." *Id.* at *9. It then concluded that, "[w]hile such conduct may involve a risk of causing emotional distress to the person who is the subject of the criminal prosecution, that risk cannot be characterized as unreasonable in light of the importance to our society of the prosecution of those who violate its criminal laws." *Id.* (quoting *Silberberg v. Lynberg*, 186 F. Supp. 2d 157, 177 (D. Conn. 2002)).

Defendants argue that the conclusion in the latter case is warranted here. They argue that the record shows that Poynton and Dunn explained to Plaintiff the rules and regulations he needed to follow—that he needed to inert and clean the UST with a fire watch before removing it from the ground—and that Plaintiff failed to follow these instructions. [Dkt. 41-1 at 31]. Defendants point out that testing of the UST showed high concentrations of flammable vapors, evidencing the actual danger the UST posed. *Id.* Thus, Defendants argue that their conduct did not create and unreasonable risk of causing Plaintiff emotional distress. *Id.*

The Court agrees with Defendants. As discussed *supra*, Defendants reasonably believed that there was probable cause that Plaintiff recklessly endangered himself and the public and failed to abate a fire hazard. Plaintiff was aware that prior testing showed some contamination in and around the UST, Defendants explained to Plaintiff the proper process for rendering a UST safe prior

to removal from its grave, but Plaintiff proceeded to remove the UST without following those procedures.  Following additional testing, which confirmed the presence of flammable vapors, Defendants, along with other local and state representatives, evaluated the evidence and determined that there was probable cause to bring charges against Plaintiff.  As with any prosecution, there may have been some risk of causing emotional distress to Plaintiff in bringing charges against him, but that risk was not unreasonable given the evidence supporting Defendants' belief that probable cause existed and in light of the importance of enforcing our laws.  *See Silberberg*, 186 F. Supp. 2d at 177.

Plaintiff's negligent infliction of emotional distress claim fails because the Court has concluded that any risk that Defendants' conduct would cause Plaintiff emotional distress was not unreasonable.  The Court need not address the arguments regarding the severity of Plaintiff's distress or governmental immunity. Defendants are entitled to summary judgment on Count III.

## Conclusion

For the foregoing reasons, the Court GRANTS summary judgment for Defendants on all remaining claims.  The Clerk is directed to close the case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Order dated in Hartford, Connecticut on March 11, 2019.